UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CONSTANCE SHIVERS, | Civil No. 04-4587 (JRT/FLN) |
| Plaintiff, | |
| v. | |
| JO ANNE B. BARNHART, Commissioner of Social Security, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Neut L. Strandemo, for Plaintiff.
Lonnie F. Bryan, Assistant United States Attorney, for the Government.

Plaintiff Constance Shivers seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied her application for disability insurance benefits ("DIB") and a period of disability. See 42 U.S.C. §§ 416(i), 423(d). The matter has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claim pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment [#9 and #16]. For the reasons set forth below, the Court recommends that the Commissioner's decision be affirmed.

## I. INTRODUCTION

Ms. Shivers applied for DIB and a period of disability on August 12, 2002, alleging an onset date of December 20, 2000. Ms. Shivers claimed that she was disabled because of degenerative cervical disc disease, shoulder problems, arthritis, and nerve impingement. (Tr. 51-56, 58, 92). The Social Security Administration denied the application initially and upon reconsideration. (Tr. 32-47,

291-319). Ms. Shivers timely filed a request for a hearing, which was held before Administrative Law Judge ("ALJ") Harold B. Herseth on October 2, 2003. (Tr. 29, 291-319). ALJ Donald Holloway, for ALJ Harold B. Herseth, rendered an unfavorable decision dated December 1, 2003. (Tr. 19-28). Ms. Shivers' appeal to the appeals council was denied, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-18, 282-290); See also 20 C.F.R. § 404.981.

Ms. Shivers initiated this action in federal court seeking judicial review on October 26, 2004. She moved for summary judgment on March 21, 2005. [ #9]. Ms. Shivers raises three issues in her motion: (1) Whether the ALJ properly analyzed the medical evidence and assessed her residual functional capacity ("RFC"); (2) whether the ALJ improperly rejected the opinions of her treating physicians and substituted the opinions of the non-examining physicians; and (3) whether the ALJ erroneously applied Grid Rule 210.10.

## II.  STATEMENT OF FACTS

### A.   Background

Ms. Shivers was born on July 2, 1950, and was 53 at the time of the administrative hearing (Tr. 22). At the time of the ALJ's decision, Ms. Shivers was considered to be a "person closely approaching advanced age" (Tr. 19, 51). See 20 C.F.R. § 404.1563 (d). Ms. Shivers worked in the past as a retail sales worker, a general office clerk, and a licensed practical nurse (Tr. 27, 59, 103-108, 115).

### B.   Medical Evidence

Ms. Shivers has a long history of neck and shoulder pain. She was diagnosed with cervical degenerative disc disease and a right shoulder impingement in December 2000, by Barbara Seizert, M.D. (Tr. 214-15). These medical problems stem in part from an injury Ms. Shivers suffered while

working in 1993.  (Tr. 214).  Ms. Shivers received treatment for shoulder and neck problems from 2000 through 2003 from Dr. Seizert and Christopher Metz, M.D.  (Tr. 163-281).

### i        Shoulder Impairments

In February 2001, Dr. Metz performed arthroscopy, arthroscopic decompression, open distal clavicle excision, and a rotator cuff tear repair on Ms. Shivers' right shoulder.  (Tr. 118-134, 232).  After the surgery, Ms. Shivers underwent a physical therapy program and took anti-inflammatories.  (Tr. 207, 228-231).  Six months later, she reached maximum medical improvement for her right shoulder with only some tenderness throughout her upper body and arms.  (Tr. 229).  At this time, she was working six hours per day four days a week.  (Tr. 229).

Ms. Shivers, however, continued to have problems with her right shoulder.  On September 4, 2001, she complained to Dr. Metz that her shoulder was painful and that Vioxx was not helping.  Dr. Metz assessed right shoulder trigger point pain and prescribed Mobic.  (Tr. 228).

In July of 2002, Ms. Shivers went to see Dr. Metz for left shoulder pain.  (Tr. 220).  He assessed left shoulder impingement and scheduled facet injections in the cervical spine.  At that time, Ms. Shivers was working approximately twenty hours per week.  (Tr. 220).

She returned to Dr. Metz in December 2002 for left shoulder pain, and was given another injection.  (Tr. 218).  Dr. Metz noted during this visit that Ms. Shivers had a good range of motion in her left shoulder and minimal pain in rotator cuff strength tests.  (Tr. 218).

In January 2003, Ms. Shivers saw Dr. Metz for right shoulder pain.  She reported that the left shoulder injections had significantly reduced the pain in her left shoulder and that she was "quite happy" with the improvement.  (Tr. 264).  Dr. Metz assessed that Ms. Shivers would have "permanent restrictions" in her right shoulder, and that she was not able to lift greater than five

pounds to shoulder level or overhead, and could not perform repetitive overhead or shoulder-level activities. (Tr. 264).

In March 2003, Ms. Shivers complained to Dr. Metz of low back pain and renewed left shoulder pain. (Tr. 263). Dr. Metz noted that she had full active and passive range of motion in her left shoulder, despite some pain. (Tr. 263). She also had intact motor sensation and a full range of motion in her hips without any pain. (Tr. 263). Dr. Metz recommended that she exercise and take Tylenol and Aleve for her back pain. For her left shoulder he offered arthroscopy decompression and distal clavicle excision. (Tr. 263).

By September 2003, Ms Shivers' left shoulder pain had worsened. (Tr. 260). Dr. Metz administered a cortisone injection and discussed surgical intervention. He recommended Ms. Shivers do no shoulder-level or overhead lifting and no lifting greater than ten pounds at her waist with her arms at her side. Dr. Metz, however, did not limit Ms. Shivers work hours. (Tr. 260).

    **ii.**     **Neck Impairment**

In December of 2001 Ms. Shivers saw Dr. Metz to seek relief from neck pain. (Tr. 227). Dr. Metz reaffirmed the previous cervical degenerative disc disease diagnosis, and prescribed physical therapy. (Tr. 227).

She also sought medical help from Dr. Seizert for the same problem in January of 2002. (Tr. 209-210). Dr. Seizert recommended that she take three weeks off work and continue her physical therapy. (Tr. 209-210).

In March 2002, John Sherman, M.D., at the Low Back Institute recommended that Ms. Shivers receive a nerve block for pain in her neck. Dr. Metz affirmed the recommendation. (Tr. 222). At that time, Ms. Shivers was working four hours a day four days a week.

In May 2002, Ms. Shivers returned to Dr. Seizert with complaints of neck pain, though she had felt "very little pain for weeks." (Tr. 204). Dr. Seizert found that Ms. Shivers could lift up to five pounds, but could not engage in overhead lifting (Tr. 204). Dr. Seizert prescribed more Vicadin, but also increased Ms. Shivers' work hours to twenty a week.

Ms. Shivers' neck pain continued throughout 2002 and she underwent a series of injections to treat the pain. (Tr. 204, 219-221). In August 2002, Ms. Shivers went to the emergency room complaining of serious neck pain. (Tr. 164). Upon examination, Li Hong, M.D., noted that she had a full range of motion in her neck, and that she did not appear to move as if she were in significant discomfort. Dr. Hong also noted that Ms. Shivers had prescriptions for Vicodin and Mobic, but that she reported taking both only intermittently (Tr. 164).

In October 2002, Ms. Shivers underwent a rhizotomy procedure for her neck problems. (Tr. 202, 219). She was off work at the time of the rhizotomy and stayed off work for three weeks following the procedure. (Tr. 202).

### iii.   Neurological Problems

Ms. Shivers sought treatment from Jack Hubbard, M.D., in January 2003, for a possible seizure disorder. (Tr. 277-79). Based on unusual EEG activity, Dr. Hubbard recommended Ms. Shivers undergo an MRI. (Tr. 245-46). The MRI was unremarkable. (Tr. 249).

In August 2003, Ms. Shivers underwent additional testing for a seizure disorder or sleep apnea. (Tr. 249; 270-272). Kevin Xie, M.D., found her to be suffering from upper airway resistance syndrome, chronic migraine headaches, and a possible partial seizure, and noted that she received medication for these problems. (Tr. 249). Dr. Xie also noted that Ms. Shivers appeared alert, attentive, and without language difficulty. Her cranial nerves were unremarkable; and she had

adequate muscle tone, comparable muscle strength on both sides, symmetric reflexes, and a steady gait. (Tr. 249).

### iv. State Agency Review

On October 14, 2002, a state agency physician reviewed Ms. Shivers' medical record. (Tr. 235-242). He concluded that Ms. Shivers could frequently lift ten pounds, occasionally lift twenty pounds, stand or sit for 6 hours, and that she was limited in overhead reaching ability. (Tr. 236). Aaron Mark, M.D., another state agency physician, reviewed Ms. Shivers' medical record on January 30, 2003. (Tr. 242). He determined that the conclusions reached by the first state agency physician in October 2002 were correct. (Tr. 242).

### C. Plaintiff's Testimony

At the administrative hearing on October 2, 2003, Ms. Shivers testified regarding her impairments and daily activities. (Tr. 293-319). She said she was five feet one inch tall and weighed 160 pounds. (Tr. 296). She testified that she had problems with many common household tasks because of her back and neck pain. (Tr. 305). She stated that she could not climb stairs, do laundry, shop for groceries, or garden for an extended period, but that she could cook and drive for sixty miles. (Tr. 296, 305-06). She testified that she could lift a gallon of milk with two hands and cook some things. (Tr. 302; 306). Ms. Shivers further stated that she needed to take several naps each day because she suffered from narcolepsy. (Tr. 306-11). She testified that the seizure medication she was taking helped, though it was inconsistent on a day-to-day basis. (Tr. 311-12).

### D. Vocational Expert Testimony

Julie Harren testified as a neutral vocational expert ("VE") at the administrative hearing. (Tr. 312-318). Ms. Harren classified Ms. Shivers' past work as a retail sales worker and a general office

clerk as semi-skilled and light, and her work as a nurse as semi-skilled and medium. (Tr. 115, 312). Ms. Harren opined that Ms. Shivers' skills in record keeping, report writing, data entry, computer operation, and her knowledge of medical terminology were transferable to sedentary work. (Tr. 313).

The ALJ asked Ms. Harren to consider whether a fifty-two-year-old with a high school education who could sit for six hours of an eight hour day and lift five to ten pounds occasionally could work in the national economy. (Tr. 313). Ms. Harren stated such a hypothetical person would be able to return to Ms. Shivers' past work, or perform other work utilizing her transferable skills. (Tr. 313-318). Ms. Harren testified that the hypothetical person would be able to work as a receptionist or as an information, appointment, or order clerk. (Tr. 318). Ms. Harren further testified that there are 26,050 of these clerk and receptionist jobs in Minnesota. (Tr. 318).

### E.   ALJ's Decision

In determining whether or not Ms. Shivers was disabled, the ALJ followed the five-step sequential process outlined at 20 C.F.R. § 404.1520. In the first step of the analysis, the ALJ determined that Plaintiff had engaged in substantial gainful activity since her alleged onset date of December 20, 2000, because she had returned to work in May 2001. (Tr. 23). The ALJ found that Ms. Shivers had not engaged in gainful activity after August 2, 2002. (Tr. 23, 27).

In the second and third steps of the evaluation process, the ALJ determined whether Plaintiff suffered a severe impairment. (Tr. 24). A severe impairment is defined as one that significantly limits the individual's physical or mental ability to meet the basic demands of work activity. 20 CFR §§ 416.920(c); 416.921. The ALJ found Plaintiff severely impaired by a right rotator cuff tear, degenerative disk disease and disk bulging, and generalized arthritis. (Tr. 24). The ALJ found,

however, that Plaintiff's impairments were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, subpart P, (20 C.F.R. 404.1520(d)). (Tr. 24). The ALJ also found that the Ms. Shivers failed to meet her burden in submitting acceptable medical evidence in verifying the existence of her alleged seizure disorder (Tr. 24).

In the fourth and fifth steps of the evaluative process, the ALJ determined whether Ms. Shivers' RFC permitted her to perform her past relevant work or any other work existing in significant numbers in the national economy. The ALJ determined that Ms. Shivers could stand six hours, walk six hours, sit six hours, and lift or carry twenty pounds occasionally or five to ten pounds frequently, but that she could not engage in vigorous, forceful, or frequent use of her upper extremities with respect to activities over shoulder level. (Tr. 26). The ALJ determined that Ms. Shivers could return to her positions as a retail sales clerk or general office worker because those jobs required only light exertion. (Tr. 26-27). As a result, the ALJ concluded Ms. Shivers did not suffer from a "disability" as defined under the Social Security Act at any time relevant to the decision.

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole. See 42 U.S.C. § 405(g); see also Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998); Gallus v. Callahan, 117 F.3d 1061, 1063 (8th Cir. 1997); Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See Jackson v. Apfel, 162 F.3d 533, 536 (8th Cir. 1998); Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998). In determining whether evidence is

substantial, a court must also consider whatever is in the record that fairly detracts from its weight. See Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999); see also Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).

A court, however, "may not reverse merely because substantial evidence would have supported an opposite decision." Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000) (internal citations omitted); see also Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996). Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo. See Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

## IV. CONCLUSIONS OF LAW

### A.    The ALJ's Decision Was Supported by Substantial Evidence

Ms. Shivers argues that the ALJ's decision should be overturned because the ALJ made errors of fact in reviewing the medical evidence and because he improperly rejected the opinions of Ms. Shivers' treating physicians and substituted the opinions of the state physicians. The Court disagrees and finds the ALJ's decision supported by substantial evidence.

The ALJ found that Ms. Shivers had the RFC to stand, walk or sit for six hours, and lift or carry twenty pounds occasionally or five to ten pounds frequently. He noted, however, that Ms. Shivers could not perform vigorous, forceful or frequent overhead motions. (Tr. 26). In making this finding, the ALJ considered all the evidence in the record including the objective medical evidence and medical opinions, Ms. Shivers' testimony, and the VE testimony. (Tr. 23-26).

The ALJ properly considered the medical evidence. The ALJ acknowledged that Ms. Shivers suffered from a "long history of chronic neck pain and low back pain," and that she suffered

diminished right hand strength and tenderness along the muscles of the neck and lumbar spine. (Tr. 25). He also acknowledged that she suffered episodes of blackouts associated with possible seizure activity, but that there was no clear epiliptiform activity and CT and MRI scans were negative. (Tr. 25). The ALJ also noted that an examination by Dr. Metz in January 2003, revealed good range of motion in the right shoulder and only minimal pain and weakness under rotator cuff testing. (Tr. 25; 264). At a follow-up examination in March 2003, Ms. Shivers had full active and passive range of shoulder motion, despite some pain, and intact motor sensation and a full range of motion in her hips without pain. At that time, Dr. Metz suggested Plaintiff use over the counter medications for pain relief. (Tr. 25; 263). The ALJ properly analyzed the objective medical evidence and determined that Ms. Shivers' medical impairments limited her to some degree, but not to the extent she alleged.

The ALJ also found that the medical opinions in the record did not support a total inability to work. In January 2003, Dr. Metz opined that Ms. Shivers should avoid overhead lifting of more than five pounds and any repetitive overheard or shoulder-level activities. In September 2003, Dr. Metz recommended that Plaintiff do no shoulder-level or overhead lifting and no lifting greater than ten pounds at waist level. The ALJ also considered the assessments of the state agency physicians, both of whom opined that Plaintiff retained the ability to occasionally lift twenty pounds, frequently lift ten pounds, and stand or sit for six hours. (Tr. 236; 242). The ALJ's RFC determination coincides with the medical opinions on record, and the Court finds that the ALJ properly concluded that the medical opinions supported some degree of limitation, but not a determination of complete disability.

The ALJ also considered Ms. Shivers' testimony in his RFC determination. Though Ms. Shivers testified that she had trouble performing household chores such as grocery shopping, the

ALJ noted that she admitted that she could walk, lift approximately ten pounds (a gallon of milk), drive sixty miles, fold clothes, and cook some things. (Tr. 24; 302; 306). The ALJ properly concluded that Plaintiff's activities of daily living did not support her allegations of complete disability. The Court concludes that the ALJ properly assessed Ms. Shivers' RFC based on her testimony and the medical evidence in the record.

The ALJ also properly relied on the testimony of the VE in determining that Ms. Shiver's could perform her past relevant work. Based on the ALJ's RFC determination, the VE testified that Ms. Shivers could perform a limited range of light exertional work, or a wide range of sedentary work. (Tr. 313). She stated that Ms. Shivers would be able to return to her job as a cellular sales worker. On cross-examination, the VE opined that if the sales position required too much lifting, Ms. Shivers could utilize her transferable skills in other semi-skilled sedentary work, including such positions as receptionist, information clerk, appointment clerk, and order clerk. (Tr. 318).

Based on the VE testimony, the ALJ found that return to her position as a retail sales clerk or perform work as a general office worker. The Court finds that the ALJ properly posed Ms. Shivers' RFC to the VE and properly relied on the VE's testimony in finding that Plaintiff could return to her past work or perform other positions within the national economy. See Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996); Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (testimony from VE constitutes substantial evidence when based on a properly phrased hypothetical question). Substantial evidence supports the ALJ's disability determination as a whole.

### 1. The ALJ's Error in Finding that Ms. Shivers Did Not Use Prescription Medications is Harmless

Ms. Shivers argues that the ALJ's decision should be overturned because the ALJ erroneously found that she did not take prescription drugs for her impairments. The Court disagrees. The ALJ found that Ms. Shivers' complaint that her pain and functional limitations prevented her from being able to perform any work was "inconsistent with the complete absence of the use of prescribed pain medications." (Tr. 26). The medical record and Ms. Shivers' testimony, however, reflect that Ms. Shivers has been prescribed pain medications for her impairments, including Vioxx, Vicodin, Medrol, Darvocet, and Valium. (Tr. 114, 164, 203-221; 265; 300). Though there is evidence that Ms. Shivers was prescribed prescription medications, the Court finds that the ALJ's decision is nonetheless supported by substantial evidence, and should not be reversed. See Wilson v. Apfel, 172 F.3d 539, 541 (8th Cir. 1999) (where ALJ's decision is supported by substantial evidence despite error, inappropriate to reverse ALJ's finding).

Ms. Shivers' use of prescription drugs demonstrates that her impairments are amenable to treatment and can be controlled. In May and October 2002, Ms. Shivers reported to Dr. Seizert that she had had very little pain for weeks and that she used her Mobic, Valium, and Vicodin sparingly, and used ibuprofen occasionally. (Tr. 202; 204). In March 2003, Dr. Metz recommended that she take Tylenol and Alleve for pain relief. (Tr. 263). Ms. Shivers testified during the administrative hearing that she tried to avoid taking Vicodin and Valium. (Tr. 300). Moreover, Ms. Shivers reported to her physicians on numerous occasions that the cervical and shoulder injections, the rhizotomy procedure, and the prescription medications afforded some pain relief. (Tr. 218-19; 223; 279). Ms. Shivers also underwent physical therapy for her neck and shoulder pain. (Tr. 137-62).

The record shows that Ms. Shivers has treated her impairments, with some degree of success, through the use of prescription and over-the-counter medications, physical therapy, surgeries, and

steroid injections. There is no evidence in the record that Plaintiff suffered side effects from her medications or treatments. Impairments that are controllable or amenable to treatment do not support a finding of total disability. Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999). The ALJ's erroneous finding that Ms. Shivers did not take prescription medications is harmless. Even though Ms. Shivers had been prescribed prescription medications, the record does not reflect that she was further functionally limited than already found by the ALJ. There is substantial evidence to support the ALJ's RFC and disability determination despite this error, and the Court therefore recommends the ALJ's decision be affirmed.

### 2.   The ALJ Properly Considered the Treating Physicians' Recommendations

Ms. Shivers argues that the ALJ's decision should be overturned because the ALJ substituted the opinions of the state physicians for those of her treating physicians. Generally, the opinion of a treating doctor is entitled to substantial weight and should not be ignored, and the opinion of a non-treating doctor who does not examine the plaintiff cannot typically constitute substantial evidence. Jenkins v. Apfel, 196 F.3d 922, 925-26 (8th Cir. 1999). Ms. Shivers claims that the opinions of Dr. Metz and Dr. Seizert support her contention that she can only perform less than sedentary work on a part-time basis. (Pl. Mem. pp. 3-4). The opinions of Drs. Metz and Seizert, however, do not support Ms. Shivers' claim of disability.

In determining that Ms. Shivers could perform a range of light work, the ALJ considered Dr. Metz's opinion of her limitations. (Tr. 26 referring to Tr. 260; 264). In January 2003, Dr. Metz opined that Ms. Shivers should avoid overhead lifting greater than five pounds and repetitive overhead or shoulder-level activities. (Tr. 264). In September 2003, he opined that Plaintiff should avoid overhead and shoulder-level lifting and lifting greater than ten pounds at waist level. The ALJ

incorporated the limitations found by Dr. Metz into his RFC assessment. The ALJ found that she could lift no more than five to ten pounds on a frequent basis and that she could not engage in vigorous, forceful or frequent use of her upper extremities over shoulder level. Dr. Metz specified that these were Ms. Shivers permanent restrictions and never specified that she was limited to part-time work on a permanent basis. (Tr. 260; 264).

Though Dr. Seizert had limited Ms. Shivers to part-time work in the past, she never indicated that those work restrictions were permanent. For example, Dr. Seizert recommended Ms. Shivers be off work for one month in January 2001, until she had surgery. (Tr. 211). In January 2002, Dr. Seizert suggested Ms. Shivers transition back to a part-time schedule. (Tr. 210). In October 2002, Dr. Seizert recommended that Ms. Shivers return to part-time work after her rhizotomy procedure. (Tr. 202). The record does not show that Dr. Metz and Dr. Seizert believed Ms. Shivers was permanently unable to return to full-time employment.

Dr. Metz's opinions of Ms. Shivers' limitations and abilities coincide with the ALJ's RFC determinations. The ALJ did not improperly reject the opinions of Ms. Shivers' treating physicians.

### 3. Because the ALJ Concluded Ms. Shivers Had the RFC to Perform Her Past Relevant Work, Grid Rule 210.10 Is Inapplicable

Lastly, Ms. Shivers argues that the ALJ should have found her disabled pursuant to Grid Rule 210.10. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 210.10. Rule 210.10 provides that an individual who is closely approaching advanced age with limited education and no transferable work skills, and who is limited to sedentary work, should be considered disabled. Ms. Shivers argues that the ALJ posed the wrong hypothetical to the VE based on an erroneous interpretation of the medical evidence, and that the proper hypothetical would have shown Ms. Shivers to be disabled pursuant to Rule 210.10. As discussed, however, the ALJ properly weighed the medical evidence, and posed

the correct hypothetical to the VE based on that evidence. The VE found that Ms. Shivers had transferable work skills and 13 years of education, and opined that she could return to her past relevant work or perform other sedentary work in the economy. The ALJ properly concluded that Ms. Shivers could perform her past relevant work. Rule 210.10 is inapplicable here. (Tr. 26, 64, 313).

The Court concludes that substantial evidence on the record as a whole supports the ALJ's evaluation of the medical and opinion evidence and Plaintiff's testimony. Ms. Shivers points to no error that would require this Court to reverse the ALJ's decision or remand this case for further proceedings. The ALJ properly evaluated Plaintiff's allegations and reasonably concluded that Ms. Shivers could perform her past relevant work. Substantial evidence supports the ALJ's finding that she was not disabled.

## V.  RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment [# 9] be **DENIED;** and that

2. Defendant's Motion for Summary Judgment [#16] be **GRANTED.**


DATED: February 9, 2006            s/ *Franklin L. Noel*
                                                  FRANKLIN L. NOEL
                                                  United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before March 1, 2006, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall

be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.